IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| DESIREE S. SMITH, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 3:14cv699 (REP) |
| | ) | |
| CAROLYN W. COLVIN | ) | |
| Acting Commissioner of Social Security, | ) | |
| Defendant. | ) | |
| | ) | |

REPORT AND RECOMMENDATION

Desiree S. Smith ("Plaintiff") is forty-eight years old and previously worked as an administrative assistant, a bank teller and as a private home care assistant. On February 23, 2010, Plaintiff applied for Social Security Supplemental Security Income ("SSI") under the Social Security Act ("Act"), alleging disability from aorta valve disease, sleep apnea, congestive heart failure and migraines, with an alleged onset date of February 10, 2010. On July 10, 2013, Plaintiff (assisted by a non-attorney representative) appeared before an Administrative Law Judge ("ALJ") for a hearing. The ALJ subsequently denied Plaintiff's claims in a written decision dated July 26, 2013. The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.

Plaintiff now appeals the ALJ's decision pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in assigning weight to certain medical opinions, in assessing Plaintiff's credibility and in determining Plaintiff's residual functional capacity ("RFC"). (Pl.'s Mot. for Summ. J. with Supp. Mem. of Law ("Pl.'s Mem.") (ECF No. 13) at 2). The parties have submitted cross-motions for summary judgment, which are now ripe for review. Having reviewed the parties'

submissions and the entire record in this case, the Court is now prepared to issue a report and

recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, the Court

recommends that Plaintiff's Motion for Summary Judgment (ECF No. 13) be DENIED, that

Defendant's Motion for Summary Judgment (ECF No. 14) be GRANTED and that the final

decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Because Plaintiff challenges the ALJ's decision, Plaintiff's education and work history,

medical history, function report and relevant testimony are summarized below.

### A. Education and Work History

Plaintiff was forty-three years old when she applied for SSI. (R. at 265.) Plaintiff

completed high school and graduated from a medical assistance program. (R. at 40-41.) She is a

registered medical assistant. (R. at 41.) She previously worked as an administrative assistant, a

bank teller and as a private home care assistant. (R. at 42-44.)

### B. Medical Records

#### 1. Industrial Medicine Associates, P.C.

On May 22, 2010, Plaintiff saw Sharon Revan, M.D. for a disability determination. (R. at

463.) Dr. Revan found that Plaintiff was five feet, four inches tall and weighed 265 pounds,

making her obese. (R. at 465-66.) Dr. Revan observed that Plaintiff limped on the right, was

unable to walk on her heels and toes, and could squat one-fourth of the way due to knee pain.

(R. at 465.) Plaintiff did not use an assistive device and needed no help changing for her exam

or getting on and off the exam table. (R. at 465.) Plaintiff could also rise from a chair without

difficulty. (R. at 465.) Plaintiff generally had full range of motion, though she did have lower

back pain. (R. at 466.) Dr. Revan found that Plaintiff maintained intact hand and finger

dexterity and 5/5 grip strength bilaterally. (R. at 466.) Plaintiff also had 5/5 upper and lower extremity strength. (R. at 466.)

Dr. Revan diagnosed Plaintiff with mitral valve prolapse, supraventricular tachycardia, migraines, gastroesophageal reflux disease, carpal tunnel syndrome, sleep apnea, angina and neuropathy. (R. at 466.) Dr. Revan assessed Plaintiff's prognosis as fair. (R. at 466.) Plaintiff had no limitations with speech, vision or hearing, with her upper extremities for fine and gross motor activity and with regard to personal grooming. (R. at 467.) Plaintiff had mild limitations in sitting and standing due to back pain and mild limitations lying down and climbing stairs due to shortness of breath. (R. at 467.) Dr. Revan also opined that Plaintiff had mild limitations in walking due to palpitations and shortness of breath, and mild limitations with daily living due to chest pain and shortness of breath. (R. at 467.)

### 2. VCU Health System

On June 7, 2011, Plaintiff saw James P. Bennett, M.D. regarding her migraines. (R. at 730.) Plaintiff reported having headaches since the age of thirteen and noted dizziness and lightheadedness as symptoms. (R. at 730.) Plaintiff denied nausea, vomiting and sensitivity to light or sound, although she felt bright sunlight might have made her headaches worse. (R. at 730.) She also denied any other precipitating or exacerbating factor for the headaches. (R. at 730.) Dr. Bennett prescribed generic Topamax for her migraines and ordered an MRI of her brain. (R. at 733.)

On July 7, 2011, Plaintiff contacted the neurology department of the VCU Health System to report that Topamax affected her vision. (R. at 741.) She reported that even though she could see, she could not read fine print. (R. at 741.) Plaintiff's August 22, 2011 MRI revealed no acute intracranial abnormality, but cerebellar tonsillar herniation, which could represent Chiari 1

3

malformation. (R. at 740.) On October 6, 2011, Plaintiff contacted the neurology department of the VCU Health System again to complain that Topamax blurred her vision. (R. at 761.)

On October 13, 2011, Plaintiff saw Hamid Sadeghian, M.D. regarding her eleven-year history of bilateral wrist pain and numbness. (R. at 746.) Though she was previously diagnosed with carpal tunnel syndrome and advised to have surgery, Plaintiff opted against surgery and reported that physical therapy was helpful. (R. at 746.) She was not splinting her wrists at night. (R. at 746.) Neurological tests showed bilateral carpal tunnel syndrome and left ulnar neuropathy in the forearm area. (R. at 751.)

On October 18, 2011, Plaintiff saw Sandeep Singh Kahlon, M.D. regarding her headaches. (R. at 770.) Dr. Singh performed a neurological exam, which revealed that Plaintiff was alert and oriented, cooperative, interactive and in no acute distress. (R. at 772.) Plaintiff reported nearly constant headaches, though Excedrin helped relieve them for short periods of time. (R. at 770.) She reported that she stopped taking Topamax and that her vision had returned to baseline. (R. at 770.) She stated that she took Topamax in the past, and that it had helped her without side effects. (R. at 770.) Dr. Kahlon again prescribed brand-name Topamax, because it did not seem to cause blurred vision, unlike its generic substitute. (R. at 774.) He also ordered wrist splints for Plaintiff's carpal tunnel and arranged for an MRI of her left elbow. (R. at 774.)

On January 17, 2012, Plaintiff returned for a follow-up appointment with Dr. Kahlon. (R. at 785.) Plaintiff reported little improvement in her headaches with Topamax, so Dr. Kahlon increased her dosage. (R. at 785, 789.) Dr. Kahlon opined that her weight may be affecting her sleep apnea and headaches. (R. at 789.) He observed a wide gait secondary to her weight. (R. at 788.) Dr. Kahlon referred Plaintiff to bariatric surgery for weight loss intervention. (R. at 789.)

4

He also recommended wrist splints for her carpal tunnel syndrome, but she repeated that she was not interested in surgery for her wrists. (R. at 789.) Dr. Kahlon conducted physical examinations during Plaintiff's appointments on July 11, 2012 and November 30, 2012, which revealed no changes. (R. at 836-37, 841-42.)

On February 15, 2013, Dr. Kahlon completed a Headaches Disability Questionnaire. (R. at 855-60.) He diagnosed her with migraines and labeled her prognosis as fair, noting that he was continuing his work-up and treatment. (R. at 855.) He noted that Plaintiff's headaches were severely intense and created mental confusion, inability to concentrate, visual disturbances, nausea, vomiting and photosensitivity. (R. at 856.) Though Dr. Kahlon did not know Plaintiff's headache triggers, he noted that coughing, straining, bowel movements and stress could make her headaches worse. (R. at 856-57.) Dr. Kahlon opined that Plaintiff's headaches could be caused by Chiari malformation. (R. at 857.) He noted that Plaintiff had tried multiple medications, but that she only had a mild response to Topamax. (R. at 857.)

Dr. Kahlon opined that headaches frequently would interfere with Plaintiff's attention and concentration. (R. at 858.) Plaintiff could tolerate low work stress, because her headaches made focusing difficult. (R. at 859.) Plaintiff generally would be precluded from performing even basic work activities while experiencing a headache, and she likely would be absent from work about two to three times per month. (R. at 859.)

### 3. Henrico Doctors' Hospital

Plaintiff visited the emergency room multiple times, and she denied photophobia and blurred vision on each visit. (R. at 928, 956, 968, 981, 1006, 1031.) On June 16, 2011, she went to the emergency room for a sore throat or allergies. (R. at 1029.) A physical examination revealed that Plaintiff had normal vision. (R. at 1032.) On November 28, 2011, she presented to

the emergency room again for dizziness, and her vision was again normal at a physical

examination. (R. at 1005, 1007.) On January 20, 2012, Plaintiff returned to the emergency room

for general weakness, headache and dizziness. (R. at 980.) The attending physician diagnosed

her with fatigue, weakness and a viral illness, but her vision was normal during a physical

examination. (R. at 982, 984.)

On April 6, 2012, she presented to the emergency room, complaining again of migraines.

(R. at 955.) A physical examination revealed normal findings, and Plaintiff was discharged

without performing tests or administering medication. (R. at 956-59.) On December 17, 2012,

Plaintiff visited the emergency room for migraines, shortness of breath and palpitations. (R. at

927.) A physical examination again revealed normal findings. (R. at 929.)

4. Bambi L. Gladfelter, D.O.

On December 1, 2011, Plaintiff saw Bambi L. Gladfelter, D.O., complaining of dizziness.

(R. at 895.) Dr. Gladfelter's physical examimantion revealed that Plaintiff maintained full range

of motion and no joint tenderness. (R. at 896.) Other findings were also normal. (R. at 896.)

On December 13, 2011, Plaintiff saw Dr. Gladfelter again. (R. at 894.) Dr. Gladfelter found that

Plaintiff was awake, alert and oriented. (R. at 894.) Dr. Gladfelter also noted that Plaintiff's labs

were abnormal and recommended that Plaintiff monitor her diet for less carbohydrates and fats.

(R. at 894.) On January 23, 2012, Dr. Gladfelter diagnosed Plaintiff with fatigue and a urinary

tract infection, but a neurological exam again revealed that Plaintiff was awake, alert and

oriented, and that her mood was appropriate. (R. at 891-92.) On March 14, 2012, Plaintiff saw

Dr. Gladfelter, complaining of fatigue, migraines, nausea, diarrhea and tender calves. (R. at

882.) Dr. Gladfelter diagnosed Plaintiff with insomnia, fatigue and hypertension, but there was

nothing out of the ordinary found during a physical examination. (R. at 883.)

6

On March 26, 2012, Dr. Gladfelter completed the Disability Questionnaire. (R. at 823-831.) Dr. Gladfelter diagnosed Plaintiff with fatigue, dizziness and migraines. (R. at 824.) Dr. Gladfelter noted that Plaintiff's labs were mildly abnormal, but she did not have copies of imaging studies. (R. at 824.) Dr. Gladfelter opined that Plaintiff's prognosis was good to fair, but added that this should be determined by a neurologist. (R. at 824.) Dr. Gladfelter rated Plaintiff's levels of pain and fatigue as eight to nine on a ten-point scale. (R. at 826.) Dr. Gladfelter indicated that she had been unable to completely relieve Plaintiff's pain with medication without unacceptable side effects. (R. at 826.)

Dr. Gladfelter opined that Plaintiff could sit for eight hours and stand or walk for one hour during a workday. (R. at 826.) Additionally, Plaintiff could lift five to ten pounds occasionally and carry zero to five pounds occasionally, but she would have significant limitations doing repetitive reaching, handling, fingering or lifting. (R. at 826-27.) Dr. Gladfelter found that Plaintiff would have moderate or significant limitations in grasping, turning and twisting objects with her right upper extremity and similar limitations using her fingers and hands for fine manipulations with both upper extremities. (R. at 827.) Plaintiff had minimal limitations related to her ability to use both arms for reaching. (R. at 827.) Dr. Gladfelter could not opine regarding Plaintiff's ability to keep her neck and head in a constant position. (R. at 828.) Dr. Gladfelter recommended diet and exercise in addition to medications. (R. at 828.)

Dr. Gladfelter found that Plaintiff's symptoms were severe enough to interfere with her attention and concentration frequently. (R. at 828.) She found that Plaintiff's impairments have lasted or could last longer than twelve months. (R. at 829.) Psychological or emotional factors contributed to the severity of Plaintiff's symptoms, because she had several chronic medical problems requiring sedating medications that exacerbated her fatigue. (R. at 829.) Plaintiff

7

would have good days and bad days with her conditions and, on average, Plaintiff likely would miss work more than three times a month due to her impairments. (R. at 829.) Ultimately, Dr. Gladfelter deemed Plaintiff capable of low-stress work due to her memory and processing difficulties, but advised that a specialist should determine consistency between symptoms and degree of physical abnormality. (R. at 829-30.)

On April 16, 2012, Plaintiff saw Dr. Gladfelter and reported feeling a little better after a carbon monoxide poisoning, though she experienced some fatigue and dizzy spells. (R. at 876.) Dr. Gladfelter assessed fatigue and hypertension and adjusted Plaintiff's hypertension medication. (R. at 877.) On May 16, 2012, Plaintiff reported numbness and dizzy spells. (R. at 873.) Dr. Gladfelter assessed dizziness and again recommended that Plaintiff see a neurologist, noting that she had discussed this with Plaintiff "many times." (R. at 874.)

On September 7, 2012, Plaintiff returned to Dr. Gladfelter, complaining of headaches. (R. at 870-72.) Dr. Gladfelter assessed headaches, found mild weakness in Plaintiff's hand grip and restarted Topamax. (R. at 870-71.) Dr. Gladfelter again referred Plaintiff to a neurologist. (R. at 871.) On September 20, 2012, Plaintiff returned for a follow-up appointment regarding her migraine medication. (R. at 867.) Plaintiff stated that she had the most success with brand name Topamax, which insurance would not cover, but the generic version gave her blurred vision. (R. at 867.) Dr. Gladfelter prescribed Depakote and Fioricet for Plaintiff's headaches. (R. at 868.) On February 15, 2013, Plaintiff saw Dr. Gladfelter due to a mouth infection. (R. at 864.) Plaintiff denied headaches at that time. (R. at 865.) On April 18, 2013, Plaintiff saw Dr. Gladfelter, complaining of bilateral hip pain and tenderness, fatigue, polydipsia and polyuria, but again denied headaches. (R. at 861-62.)

8

On July 19, 2013, Plaintiff reported bilateral hip pain, fatigue, polydipsia, polyuria and insomnia, but denied polyphagia or blurry vision. (R. at 1052.) She again denied headaches during this visit. (R. at 1053.) Dr. Gladfelter diagnosed Plaintiff with hip pain for which she referred Plaintiff to a physical therapist. (R. at 1053.) She also assessed insomnia for which she prescribed Ambien. (R. at 1053.) Dr. Gladfelter directed Plaintiff to take her diabetes medication consistently. (R. at 1053.)

On September 11, 2013, Plaintiff saw Dr. Gladfelter, complaining of pain in her right leg. (R. at 1049.) Dr. Gladfelter ordered an x-ray of Plaintiff's hip and an MRI of her spine. (R. at 1050.) On October 14, 2013, Dr. Gladfelter assessed hypertension, hypercholesteremia, sciatica and impaired glucose tolerance. (R. at 1047.) Plaintiff denied headaches during both her September and October appointments. (R. 1047, 1050.)

5. Philip P. O'Donnell, M.D.

Dr. Gladfelter referred Plaintiff to Philip P. O'Donnell, M.D., a neurologist. On June 27, 2012, Plaintiff saw Dr. O'Donnell for dizziness, headaches and an Arnold Chiari malformation. (R. at 912.) Dr. O'Donnell's exams revealed that Plaintiff's muscle strength and range of motion were normal. (R. at 915-16.) Plaintiff's eyes were normal with her visual acuity grossly normal. (R. at 914.) Dr. O'Donnell noted that Plaintiff was overweight, but she refused evaluation for bariatric surgery. (R. at 912.) Dr. O'Donnell performed a neurological exam that revealed that Plaintiff was grossly oriented to person, place and time. (R. at 916.) Dr. O'Donnell assessed common intractable migraines with Arnold Chiari malformation and cough headache component and prescribed Topamax. (R. at 916.)

C. Function Report

9

On April 10, 2010, Plaintiff completed a Function Report. (R. at 316-23.) At the time of the report, Plaintiff lived in an apartment with family. (R. at 316.) Plaintiff's daily routine included getting herself and her eight-year-old daughter ready and taking her daughter to school using public transportation. (R. at 317.) Plaintiff then returned to bed to rest, because she was short of breath and her heart was racing from walking up the train stairs. (R. at 317.) Plaintiff could care for herself and did not need reminders to take care of personal needs, but she got tired quickly during these activities. (R. at 317-18.) She also noted that she did not sleep well. (R. at 317.)

Plaintiff prepared her own meals. (R. at 318.) She prepared food every day for herself and her daughter. (R. at 318.) Cooking took one to two hours, which she stated was longer than it would normally take her. (R. at 318.) Plaintiff could manage household chores such as sweeping, dishes and dusting. (R. at 319.) She could walk, use public transportation and had a driver's license. (R. at 319.) Plaintiff also managed her money and could shop in stores. (R. at 320.) Plaintiff's hobbies included singing, reading and watching television, and she tried to engage in these hobbies daily. (R. at 320.) She also went to church every Sunday and went out to eat with her family. (R. at 321.)

Plaintiff reported that her conditions of shortness of breath, migraines and heart racing affected her ability to lift, stand, walk, sit, climb stairs, kneel, squat, use her hands and talk. (R. at 321.) Plaintiff could walk up to two blocks before having to stop and rest for five to ten minutes. (R. at 322.) Plaintiff had no problems paying attention, finishing what she started, following spoken or written instructions or getting along with authority figures. (R. at 322.) She noted that she had trouble remembering things, possibly due to multiple surgeries with general anesthesia. (R. at 323.)

D.  Plaintiff's Testimony

On July 10, 2013, Plaintiff (assisted by a non-attorney representative) testified during a hearing before the ALJ.  (R. at 33-83.)  Plaintiff was forty-six years old at the time and lived in an apartment with two of her children.  (R. at 39-40.)  Plaintiff had four other children.  (R. at 40.)  Plaintiff completed high school and became a registered medical assistant.  (R. at 40-41.)  She received child support and food stamps each month.  (R. at 41.)

Plaintiff had not worked since 2009 or 2010 as an administrative assistant for a private neurologist.  (R. at 41-42.)  This position required mostly sitting, but a lot of walking as well.  (R. at 42.)  Before that position, Plaintiff worked in private home care for about fifteen years, but that did not involve lifting.  (R. at 42.)  She worked in banking from 1996 to 1998, which likewise did not require lifting.  (R. at 42-44.)  Plaintiff worked for Wal-Mart part-time while in her medical assistance program and also briefly worked for a hotel.  (R. at 44-45.)

Plaintiff testified that she was unable to work because of debilitating migraines and difficulty with her memory.  (R. at 45-46.)  She explained that her migraine pain had been consistent for over thirty years, and she felt that she could not function normally.  (R. at 46.)  Her headaches had become more recognizable to her over the past several years.  (R. at 69.)  She testified that her migraines occurred all the time every day.  (R. at 46.)  She described a throbbing pain, which may be throughout her whole head or just in certain areas, and she never knew when it was going to happen.  (R. at 47-48.)  Plaintiff had dizzy spells due to headaches.  (R. 48.)  Fumes may have made her headaches worse.  (R. at 54.)

Plaintiff stated that she took Topamax, Gabapentin and Ambien. (R. at 47-48.) Topamax was supposed to prevent headaches, but because her migraines were constant, it actually made her headaches worse. (R. at 48-49.) None of her medications alleviated her headaches completely, although they slowed the headaches down. (R. at 49.) She also stated that her medications put her to sleep. (R. at 50.)

Plaintiff testified that her pain was almost a ten on a scale of one to ten, but medication alleviated her pain somewhat. (R. at 49-50.) After taking her medication the morning of the hearing, Plaintiff rated her head pain at a six or seven on the scale. (R. at 50-51.) If she stayed still in a quiet space, her pain went down to a five. (R. at 50.) Plaintiff would lie down for six to seven hours a day, because she believed it helped with the dizziness. (R. 51-52.) Plaintiff could not answer affirmatively whether she needed to lie down every day. (R. at 51-52.) She also noted that she got up from lying down to cook. (R. at 51-52.) She did not have difficulty sitting, but sporadically had trouble standing due to dizziness. (R. at 52.) She could stand for an hour and walk for thirty to forty-five minutes. (R. at 53.) She could lift five pounds. (R. at 54.)

Although Plaintiff stated that she experienced back pain, her back pain was not severe and she did not complain about it. (R. at 54.) Her carpel tunnel, however, interfered with her ability to work, because the medical field required hand usage and her hands were very weak or numb. (R. at 55.) Carpal tunnel made it difficult for her to type. (R. at 70.) Plaintiff's hands were numb all the time. (R. 71.) Plaintiff testified that she ignored her symptoms despite her condition worsening in the past several years. (R. at 71.) She refused surgery and did not use wrist splints, because she believed that only the expensive ones would work and she could not afford those. (R. at 72-74.)

12

Plaintiff also testified that she dressed and showered herself daily and shampooed her own hair. (R. at 55, 66.) She could button buttons and tie a shoelace. (R. at 67.) She prepared full meals as often as she could, which in the wintertime meant about every day, and in the summertime two days a week. (R. at 56-57.) She was unable to use a can opener, but could peel a potato with some difficulty. (R. at 66.) She could use a fork and knife to cut very soft foods, and she could open a jar, but it took her awhile. (R. at 66-67.) She stated that her son did the dishes, possibly because she dropped things so frequently. (R. at 57-58.)

Plaintiff testified that she swept, mopped and vacuumed approximately once a week, but noted that she could not sweep because of pain in her hand and that she vacuumed with her left hand for better grip. (R. at 58.) She made her bed every day and did laundry every other day. (R. at 58-59.) She also cleaned the bathroom, but her son helped her clean the bathtub. (R. at 59.)

Plaintiff testified that she held a driver's license, but had stopped driving when she lost her car two weeks before the hearing. (R. at 59.) Until that point, she had been driving once a week to and from church, which was twelve miles away. (R. at 59-60.) She was unable to attend church approximately three times in four months due to her medical conditions. (R. at 70.) She also attended weekly Bible studies and choir practice, but she was picked up for those events. (R. at 61-64.) Plaintiff could go to the grocery store with her kids each month and get food or a movie rental for family nights once a week. (R. at 53, 64-65.) She watched movies with her kids and took them to lunch or dinner. (R. at 46-47.) She took her son shopping, though she stayed in the car. (R. at 65.) She socialized with two friends over the phone. (R. at 68.) She stated that her hobbies included reading and watching television daily, as well as

singing.  (R. at 60-61, 63.)  Although Plaintiff could not use a computer for very long periods of

time because of pain, she conducted internet research about once a week.  (R. at 63.)

## II. PROCEDURAL HISTORY

On February 23, 2010, Plaintiff filed an application for SSI, claiming disability due to

aorta valve disease, sleep apnea, congestive heart failure and migraines with an alleged onset

date of February 10, 2010.  (R. at 265-68, 287, 291.)  The claim was initially denied on June 17,

2010.  (R. at 133-138.)  Plaintiff filed a written request for a hearing on August 16, 2010, and the

ALJ held a hearing on August 17, 2011.  (R. at 139, 86-108.)  On September 22, 2011, an ALJ

issued a written opinion, denying Plaintiff's claim and concluding that Plaintiff was not disabled

under the Act, because Plaintiff could perform her past work as both actually and generally

performed.  (R. at 114-126).  Plaintiff appealed the ALJ's decision and, on March 22, 2013, the

Appeals Council vacated and remanded for further proceedings.  (R. at 127-132).  Another ALJ

held a hearing on July 10, 2013 (R. at 33-83.)  The ALJ issued a decision on July 16, 2013,

finding that Plaintiff was not disabled under the Act, because Plaintiff could make a successful

adjustment to other work that existed in significant numbers in the national economy.  (R. at 16-

32.)  On August 19, 2014, the Appeals Council denied Plaintiff's request for review, rendering

the ALJ's decision the final decision of the Commissioner subject to judicial review by this

Court.  (R. at 1-5.)

## III. QUESTIONS PRESENTED

1.  Did the ALJ err in affording no weight to Dr. Gladfelter's opinion and to Dr. Kahlon's
opinion?

2.  Did the ALJ err in assessing Plaintiff's credibility?

3.  Did the ALJ err in assessing Plaintiff's functional limitations?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, is less than a preponderance and is the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). The substantial evidence standard assumes a choice for an ALJ to go either way, without interference by the courts, and the ALJ's decision is not subject to reversal simply because substantial evidence could support the opposite decision. *Dunn v. Colvin*, 2015 WL 3451568, at *5 (4th Cir. June 1, 2015).

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472 (quoting *Johnson*, 434 F.3d at 653). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2000). An ALJ conducts the analysis for the Commissioner, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether substantial evidence in the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 404.1520(b), 416.920(b). SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.*

If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to

16

function. 20 C.F.R. § 404.1520(c). If the claimant's medical impairments do not meet the severity and duration requirements, the claimant must be found "not disabled." *Mascio v. Colvin*, 780 F.3d 631, 634-35 (4th Cir. 2015).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment does not meet or equal a listed impairment, the ALJ does not deny benefits but rather proceeds with the evaluation. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Mascio*, 780 F.3d at 635. The ALJ must determine whether the claimant can return to her past relevant work[1] based on an assessment of the claimant's RFC[2] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e); *Mascio*, 780 F.3d at 635. If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from performing his past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock,* 667 F.3d at 472.

---

[1]   Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 404.1565(a), 416.965(a).

[2]   RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. RFC is the most a claimant can do despite physical and mental limitations affecting his ability to work. 20 C.F.R. § 416.945(a)(1). When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. SSR-96-8p (footnote omitted). The ALJ must consider all of the claimant's medically determinable impairments, even those not labeled as severe in the second step of the analysis. 20 C.F.R. § 416.945(a)(2).

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 416.920(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry her burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

## V. ANALYSIS

### A. The ALJ's Decision

On July 10, 2013, the ALJ held a hearing during which Plaintiff (assisted by a non-attorney representative) and a vocational expert ("VE") testified. (R. at 33-83.) On July 26, 2013, the ALJ rendered her decision in a written opinion determining that Plaintiff was not disabled under the Act. (R. at 16-28.)

The ALJ followed the five-step sequential evaluation process as established by the Act in analyzing whether Plaintiff was disabled. (R. at 20-28.) At step one, the ALJ determined that Plaintiff had not engaged in SGA since February 10, 2010— Plaintiff's alleged onset date. (R. at

21.)  At step two, the ALJ determined that Plaintiff suffered the severe impairments of mitral valve prolapse, supraventricular tachycardia, migraine headaches, carpal tunnel syndrome, angina, neuropathy and obesity.  (R. at 21.)  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 23.)

The ALJ further found that Plaintiff maintained the RFC to perform sedentary work as defined by 20 C.F.R. § 416.967(a), but with certain limitations.  (R. at 23.)  Plaintiff could occasionally lift and carry up to ten pounds and frequently lift and carry five pounds.  (R. at 23.)  Plaintiff had no limitations with respect to sitting and could stand for six hours in an eight-hour workday.  (R. at 23.)  She could occasionally climb ramps and stairs, but never ladders, ropes or scaffolds, and she could occasionally balance, stoop, kneel, crouch and crawl.  (R. at 23.)  Plaintiff must avoid exposure to hazards such as machinery, heights, fumes, strong odors and gases.  (R. at 23.)  She could perform simple and repetitive work or work with a Specific Vocational Preparation ("SVP") of no more than two in a non-production oriented work setting on account of her migraines.  (R. at 23).  Plaintiff could frequently handle, finger and feel, but not on a continuous or repetitive basis.  (R. at 23.)

At step four, the ALJ found that Plaintiff could not perform any past relevant work.  (R. at 26.)  Finally, at step five of the analysis, based upon Plaintiff's RFC, age, education and work experience, the ALJ determined that there were jobs existing in significant numbers in the national economy that Plaintiff could perform.  (R. at 26-27.)  Consequently, Plaintiff was not disabled under the Act.  (R. at 27.)

Plaintiff challenges the ALJ's decision, arguing that the ALJ erred in affording inappropriate weight to certain medical opinions. (Pl.'s Mem. at 4-7.) Plaintiff also claims that the ALJ erred in assessing her functional limitations. (Pl.'s Mem. at 7-8.) Finally, Plaintiff asserts that the ALJ improperly evaluated her credibility. (Pl.'s Mem. at 8-11.)

> B. Substantial evidence supports the ALJ's decisions in weighing certain medical opinions.

Plaintiff argues that the ALJ erred in affording Dr. Gladfelter's and Dr. Kahlon's opinions no weight, while giving Dr. Revan's consultative opinion great weight. (Pl.'s Mem. at 4-7.) Defendant responds that substantial evidence supports the ALJ's decision. (Def.'s Mot. for Summ. J. and Br. In Supp. Thereof ("Def.'s Mem.") (ECF No. 14) at 13-14.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments, that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512(a)-(e), 404.1527, 416.912(a)-(e), 416.927. When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. 20 C.F.R. §§ 404.1520b(a), 416.920b(a). If, however, the medical opinions are inconsistent internally with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. §§ 404.1527(c)(2)-(6), (e), 416.927(c)(2)-(6), (e).

Under the regulations, only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight. SSR 06-03p. Acceptable medical sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability. 20 C.F.R. §§ 404.1527(a), 416.913(a). The regulations also provide for the consideration of opinions from "other sources," including nurse-practitioners, physician's assistants or therapists. 20 C.F.R. §§ 404.1513(d), 416.913(d).[3] Under the applicable regulations and case law, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p. Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion is inconsistent with other evidence or when it is not otherwise well-supported. 20 C.F.R. §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d).

Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up specious inconsistencies." *Dunn*, 2015 WL 3451568, at *8 (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). Indeed, an ALJ's decision regarding weight afforded a medical opinion should be left untouched unless the ALJ failed to give a sufficient reason for the weight afforded. 20 C.F.R. § 404.1527(d).

---

[3]     The regulations detail that "other sources" include medical sources that are not considered "acceptable medical sources" under 20 C.F.R. §§ 404.1513(a) and 416.913(a). The given examples are a non-exhaustive list.

21

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors. 20 C.F.R. §§ 404.1527(c), 416.927(c). However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant is disabled as that term is defined under the Act. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors may be applied in evaluating opinion evidence from "other sources." SSR 06-03p.

   1.   The ALJ did not err in assigning no weight to Dr. Gladfelter's opinion.

Plaintiff asserts that the ALJ should have given Dr. Gladfelter's opinion controlling weight, because Dr. Gladfelter was her treating physician and her opinion is well-supported and not inconsistent with substantial evidence. (Pl.'s Mem. at 4-7.) Defendant responds that the ALJ was correct in finding that Dr. Gladfelter's opinion was not entitled to weight, because it was not supported by treatment records and it was not consistent with Plaintiff's testimony. (Def.'s Mem. at 14.)

In this case, the ALJ gave no treating source controlling weight and had to reconcile opinions from several different sources, including Dr. Gladfelter. On March 26, 2012, Dr. Gladfelter completed a Disability Questionnaire. (R. at 823-831.) Dr. Gladfelter diagnosed Plaintiff with fatigue, dizziness and migraine headaches. (R. at 824.) Dr. Gladfelter labeled Plaintiff's prognosis as good to fair, but noted that a neurologist should determine this. (R. at 824.) Dr. Gladfelter also stated that the consistency between Plaintiff's symptoms and the

22

degree of physical abnormality should be determined by a specialist. (R. at 830.) Dr. Gladfelter

noted minimal to moderate limitations with respect to Plaintiff's upper extremities. (R. at 827.)

Dr. Gladfelter also opined that Plaintiff's symptoms would interfere with her attention and

concentration frequently. (R. at 828.) Plaintiff would be capable of tolerating low stress work,

and she would be absent from work due to her impairment more than three times per month. (R.

at 829.) Ultimately, the ALJ afforded Dr. Gladfelter's opinion no weight, because it was not

supported by the treatment records in the case and it was inconsistent with Plaintiff's testimony

regarding her activities. (R. at 26.) Substantial evidence supports the ALJ's decision.

The inconsistencies in Dr. Gladfelter's opinions support the ALJ's decision. In support

of her diagnosis, Dr. Gladfelter noted that Plaintiff's labs were only "mildly abnormal," but she

did not have copies of imaging studies. (R. at 824.) Dr. Gladfelter labeled Plaintiff's prognosis

as good to fair. (R. at 824.) Dr. Gladfelter noted that a neurologist should determine Plaintiff's

prognosis and that a neurologist should evaluate Plaintiff regarding her headaches. (R. at 824,

881.) The medical records also indicate that Dr. Gladfelter instructed Plaintiff to see a

neurologist numerous times. (R. at 871, 874.) Dr. Gladfelter noted that the frequency of

Plaintiff's treatment varied, undermining notions of the consistency and severity of her

condition. (R. at 824.) Dr. Gladfelter's neurological exams revealed that Plaintiff was awake,

alert and oriented. (R. at 892, 894.) During five separate appointments with Dr. Gladfelter in

2013, Plaintiff denied even having headaches. (R. at 862, 865, 1047, 1050, 1053.)

Other medical records further support the ALJ's decision. Plaintiff denied symptoms that

would indicate severity, including nausea, vomiting and sensitivity to light and sound, when she

saw Dr. Bennett for her headaches in June 2011. (R. at 730.) Plaintiff denied photophobia

during numerous emergency room visits. (R. at 928, 956, 968, 981, 1006, 1031.) When Plaintiff

23

reported to the emergency room for headaches in January 2012, the attending physician discharged her with instructions to follow-up with her doctor if her condition did not improve. (R. at 984.) The emergency room physician discharged Plaintiff on April 2012 without performing tests or administering medication for her headaches. (R. at 959.)

Dr. O'Donnell's June 27, 2012 neurological exam revealed that Plaintiff was grossly oriented to person. (R. at 916-17.) Dr. Kahlon's October 18, 2011 neurological exam revealed that Plaintiff was alert and oriented, cooperative, interactive and in no acute distress. (R. at 772.) Plaintiff informed Dr. Kahlon that simply taking Excedrin helped relieve her headaches for short periods of time. (R. at 770.)

On May 22, 2010, Dr. Revan assessed Plaintiff's prognosis as fair. (R. at 466.) She opined that Plaintiff had no limitations with her upper extremities or with regard to personal grooming. (R. at 467.) Dr. Revan further opined that Plaintiff had only mild limitations in sitting, standing, walking and lying down. (R. at 467.) Dr. Revan found that Plaintiff maintained intact hand and finger dexterity and 5/5 grip strength bilaterally. (R. at 466.) Plaintiff also had 5/5 upper and lower extremity strength. (R. at 466.) Plaintiff appeared to be in no acute distress during Dr. Revan's exam. (R. at 465.)

Plaintiff's own statements also support the ALJ's decision. The activities that Plaintiff listed in her function report did not align with Dr. Gladfelter's opinion. According to the report, Plaintiff got herself and her eight-year-old child ready for school each day. (R. at 317.) She prepared meals and managed household chores, including sweeping, dishes and dusting. (R. at 318.) She could walk, use public transportation and drive. (R. at 319.) Plaintiff tried to engage in her hobbies of singing, reading and watching television daily. (R. at 320.) She also went to church each Sunday and went out to eat with her family. (R. at 321.) She did not have problems

24

paying attention, finishing what she started, following instructions or getting along with authority figures. (R. at 332.)

Plaintiff testified during the hearing that she could care for herself, including dressing and showering daily. (R. at 55, 66-67.) She could also take care of her household and performed chores like mopping, vacuuming, making beds, cleaning bathrooms and doing laundry. (R. at 58-59.) She prepared full meals as often as every day. (R. at 56-57.) Plaintiff drove herself to church every Sunday and attended weekly Bible studies and choir practices. (R. at 59-64.) She took her children grocery shopping and had family nights. (R. at 53, 64-65.) She watched movies with her kids and took them out to eat. (R. at 46-47.) She read and watched television daily, and conducted internet research weekly. (R. at 60-61, 63.) Plaintiff could sit without difficulty, stand for an hour, walk for thirty to forty-five minutes and lift five pounds. (R. at 52-54.) Therefore, substantial evidence supports the ALJ's decision to afford Dr. Gladfelter's opinion no weight.

2. The ALJ did not err in assigning no weight to Dr. Kahlon's opinion.

Plaintiff asserts that the ALJ should have given Dr. Kahlon's opinion controlling weight, because he was her treating physician and his opinion was well-supported and not inconsistent with substantial evidence. (Pl.'s Mem. at 4.) Defendant responds that the ALJ was correct in finding that Dr. Kahlon's opinion was not entitled to weight, because it was neither supported by treatment records nor consistent with Plaintiff's testimony. (Def.'s Mem. at 14.)

In this case, the ALJ gave no treating source controlling weight and had to reconcile opinions from several different sources, including Dr. Kahlon. On February 15, 2013, Dr. Kahlon completed a Headaches Disability Questionnaire. (R. at 855-860.) Dr. Kahlon diagnosed Plaintiff with migraines and listed her prognosis as fair. (R. at 855.) Dr. Kahlon

characterized Plaintiff's headaches as "constant." (R. at 855.) Dr. Kahlon opined that

Plaintiff's symptoms would interfere with her attention and concentration frequently. (R. at

858.) Plaintiff would be capable of tolerating low stress work, but she would be absent from

work about two to three times per month due to her impairment, and she would be precluded

from performing even basic work activities while enduring a headache. (R. at 859.)

Ultimately, the ALJ afforded Dr. Kahlon's opinion no weight, because it was not

supported by the treatment records in the case and was not consistent with Plaintiff's stated

activities. (R. at 26.) Substantial evidence supports the ALJ's decision.

Inconsistencies within Dr. Kahlon's own opinions and between his opinion and other

medical records support the ALJ's decision. On October 18, 2011, Plaintiff reported to Dr.

Kahlon that merely taking Excedrin helped relieve her headaches for short periods of time. (R.

at 770.) Dr. Kahlon performed a neurological exam, which revealed that Plaintiff was alert and

oriented, cooperative, interactive and in no acute distress. (R. at 772.) Dr. Kahlon stated that

Plaintiff's headaches were constant, but Plaintiff denied headaches during multiple appointments

with Dr. Gladfelter throughout 2013. (R. at 862, 865, 1047, 1050, 1053.) Plaintiff also denied

photophobia during multiple emergency room visits. (R. at 928, 956, 968, 981, 1006, 1031.)

On May 22, 2010, Dr. Revan observed that Plaintiff did not use an assistive device and

did not require help changing for her exam, getting on and off the exam table, or rising from a

chair. (R. at 465.) Dr. Revan found that Plaintiff maintained intact hand and finger dexterity and

5/5 grip strength bilaterally. (R. at 466.) Plaintiff also had 5/5 upper and lower extremity

strength. (R. at 466.) Plaintiff appeared to be in no acute distress during Dr. Revan's exam. (R.

at 465.)

Despite Dr. Kahlon's opinion that Plaintiff had only a mild response to Topamax, the medical records reveal conflicting reports as to the effectiveness of Topamax. Plaintiff reported still having headaches on Topamax in July 2011, and little improvement with Topamax in January 2012. (R. at 741, 785.) Plaintiff told Dr. Gladfelter in September 2012, however, that she had the most success with Topamax, though the generic version gave her blurred vision. (R. at 867.) Each time that Plaintiff visited the emergency room at Parham Doctors' Hospital, she denied blurred vision. (R. at 928, 956, 968, 981, 1006, 1031.)

Plaintiff's own statements support the ALJ's decision. For instance, Plaintiff's answers on her function report did not match Dr. Kahlon's opinion. Plaintiff reported that she got herself and her eight-year-old child ready for school each day. (R. at 317.) She prepared her own meals and cooked for her daughter. (R. at 318.) She could handle household chores, including sweeping, dishes and dusting. (R. at 319.) Plaintiff tried to engage in her hobbies of singing, reading and watching television daily. (R. at 320.) She went to church every Sunday and out to eat with her family, and could shop in stores. (R. at 320-21.) She could walk, use public transportation and drive. (R. at 319.) Plaintiff did not have problems paying attention, finishing what she started, following instructions or getting along with authority figures. (R. at 332.)

Plaintiff testified during the hearing that she could care for herself, including dressing and showering herself daily. (R. at 55, 66-67.) She could also take care of her household by mopping, vacuuming, making beds, cleaning bathrooms and doing laundry. (R. at 58-59.) She prepared full meals as often as every day. (R. at 56-57.) Plaintiff drove herself to church every Sunday and attended weekly Bible studies and choir practices. (R. at 59-64.) Plaintiff watched movies with her children and took them out to eat. (R. at 46-47.) She also took her kids grocery shopping monthly and for family nights once a week. (R. at 53, 64-65.) She read and watched

television daily, and conducted internet research weekly. (R. at 60-61, 63.) Therefore, substantial evidence supports the ALJ's decision to afford Dr. Kahlon's opinion no weight.

      C.      The ALJ did not err in assessing Plaintiff's credibility.

Next, Plaintiff argues that the ALJ erred in assessing Plaintiff's credibility, because there is little to no indication that Plaintiff's conditions would be amenable to more radical treatment, she has received little help with medications that also produce side effects and her daily activities are not reflective of an ability to maintain substantial gainful activity. (Pl.'s Mem. at 8-9.) Defendant maintains that the ALJ properly considered the factors for evaluating the credibility of Plaintiff's statements. (Def.'s Mem. at 19.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a), 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. SSR 96-7p at 1-3. In doing so, the ALJ must consider all of the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p at 5, n.3; *see also* SSR 96-8p at 13 ("The RFC assessment must be based on all of the relevant medical evidence in the record . . . ."). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent

to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility determination of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d at 595-96; SSR 96-7p at 5-6, 11. The ALJ must compare the claimant's alleged limitations to other evidence in the record, not to the claimant's RFC, as credibility should be analyzed before determining the claimant's RFC. *Mascio*, 780 F.3d at 639.

This Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *N.L.R.B. v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Id.* (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, Plaintiff's subjective allegations of pain do not alone provide conclusive evidence that Plaintiff is disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). Instead, "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

It is appropriate for an ALJ to consider medication and treatment used to alleviate a claimant's symptoms. 20 C.F.R. § 404.1529(c)(3)(iv)-(v). If the claimant requires only conservative treatment, an ALJ is reasonable in holding that the alleged disability lacks the

29

seriousness that the claimant alleges. *Dunn*, 2015 WL 3451568, at *25. Similarly, noncompliance with a treatment regimen can indicate a claimant's lack of credibility as to the severity of the alleged symptoms as well. *Dunn*, 2015 WL 3451568, at *28-29.

In this case, the ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that Plaintiff's statements regarding the intensity, persistence and limiting effects were not credible for the reasons detailed in the opinion. (R. at 25.) The ALJ went on to discuss the routine nature of Plaintiff's treatment and the mild to moderate nature of her symptoms. (R. at 25.) The ALJ addressed how Plaintiff's multiple impairments have not caused significant decline in her overall functioning, highlighting her current lifestyle. (R. at 25.) Substantial evidence supports the ALJ's decision.

Plaintiff's own statements support the ALJ's determination. Specifically, her statements support the ALJ's finding that Plaintiff's symptoms did not interfere with her current lifestyle and daily activities. (R. at 25.) According to her Function Report, Plaintiff got herself and her child ready for the day. (R. at 317.) She took her daughter to school using public transportation, walked and drove. (R. at 317, 319.) Plaintiff attended church every Sunday and went out to eat with her family. (R. at 321.) She shopped in stores. (R. at 320.) She could walk up to two blocks before needing to rest for five to ten minutes. (R. at 322.) Plaintiff managed household chores such as sweeping, dishes and dusting, and prepared meals for herself and her children. (R. at 318-19.) She continued her daily hobbies of reading and watching television. (R. at 320.) She did not have problems paying attention, finishing what she started, following instructions or getting along with authority figures. (R. at 322.)

During the July 10, 2013 hearing, Plaintiff offered further testimony that supports the ALJ's finding that Plaintiff's conditions did not interfere with her daily activities. Plaintiff

testified that she watched movies with her kids and took them out to eat. (R. at 46-47.) She could stand for an hour and walk for thirty to forty-five minutes. (R. at 53.) She dressed herself and showered herself daily. (R. at 67.) She prepared full meals as often as every day. (R. at 56-57.) Plaintiff conducted household chores and cleaning, including sweeping, mopping, vacuuming and cleaning the bathroom. (R. at 58-59.) She made her bed daily and did laundry every other day. (R. at 59.) Plaintiff drove once a week to and from church, which was twelve miles from her home. (R. at 59-60.) She also attended weekly Bible studies and choir practices, shopped at the grocery store and took her son to the store. (R. at 53, 61, 63-65.) Plaintiff went to get food or a movie rental for family nights once a week. (R. at 64-65.) She engaged in her hobbies of reading and watching television every day, and used a computer about once a week. (R. at 60-61, 63.)

Medical records also support the ALJ's decision regarding Plaintiff's credibility. Though medical records contain contradictory information regarding the effectiveness of headache medications, Plaintiff acknowledged during the July 10, 2012 hearing that medications did calm her headaches. (R. at 49.) Plaintiff stated that her pain could be nearly a ten on a scale from one to ten, but acknowledged that medication alleviated her pain somewhat. (R. at 49-51.) Despite this testimony, Plaintiff also stated during the hearing that Topamax actually made her headaches worse. (R. at 48-49.) Furthermore, she testified that her medications put her to sleep, while also reporting that she took Ambien for not being able to sleep. (R. at 47-48, 50.)

Despite Plaintiff's statements that her migraines occur all the time every day, she reported not having a headache during multiple appointments with Dr. Gladfelter. (R. at 862, 865, 1047, 1050, 1053.) Dr. Revan and Dr. Kahlon both observed that Plaintiff did not appear to be in acute distress during exams. (R. at 465, 772.) Plaintiff denied to Dr. Bennett symptoms

31

that would speak to the severity of her condition, such as nausea, vomiting and sensitivity to light or sound, with the exception of perhaps bright sunlight, in connection with her headaches. (R. at 730.) She reported to Dr. Kahlon that simply taking Excedrin helped relieve her headaches for short periods of time. (R. at 770.) Additionally, Plaintiff failed to see a neurologist regarding her headaches after Dr. Gladfelter instructed her to do so on numerous occasions. (R. at 824, 871, 874, 881.) Therefore, substantial evidence from Plaintiff's function report, hearing testimony and medical records supports the ALJ's credibility determination.

      D.     The ALJ did not err in assessing Plaintiff's functional limitations.

The ALJ determined that Plaintiff had the RFC to perform a range of sedentary work with some specific limitations. (R. at 23.) Plaintiff argues that the ALJ erred by failing to accurately describe the impact of her severe headaches and failing to indicate which, if any, limitations resulted from her obesity. (Pl.'s Mem. at 7-8.) Defendant contends that the ALJ accounted for all of Plaintiff's functional limitations credibly established in the record. (Def.'s Mem. at 17-19).

After step three of the analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). In analyzing a claimant's abilities, an ALJ must first assess the nature and extent of the claimant's physical and mental limitations and then determine the claimant's RFC for work activity on a regular and continuing basis. 20 C.F.R. § 404.1545(b). Generally, the claimant bears the responsibility to provide the evidence that the ALJ utilizes in making his RFC determination; however, before making a determination that a claimant is not disabled, the ALJ must develop the claimant's complete medical history, including scheduling consultative examinations if necessary. 20 C.F.R. § 404.1545(a)(3). The RFC must incorporate

impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. 20 C.F.R. § 404.1545(e). The ALJ must conduct a function-by-function analysis in assessing a claimant's RFC, and remand may be appropriate in cases where the ALJ fails to assess a claimant's capacity to perform relevant functions, or where the ALJ's analysis contains inadequacies that frustrate meaningful review. *Mascio*, 780 F.3d at 635-36. The assessment must include a narrative discussion of how the evidence supports each conclusion, citing specific medical facts and non-medical evidence, including daily activities and observations. SSR 96-8p.[4]

In this case, the ALJ found that Plaintiff had the RFC to perform sedentary work, except that she could only lift and carry ten pounds occasionally and five pounds frequently. (R. at 23.) Plaintiff had no limitations with respect to sitting and could stand for six of eight hours in a workday. (R. at 23.) Furthermore, Plaintiff could occasionally climb ramps and stairs, but not ladders, ropes or scaffolds. (R. at 23.) She could occasionally balance, stoop, kneel, crouch and crawl. (R. at 23.) The ALJ determined that Plaintiff needed to avoid exposure to machinery, heights, fumes, strong odors and gases. (R. at 23.) She could perform simple and repetitive work or work with an SVP of two or less in a non-production oriented work setting due to her migraines. (R. at 23.) Finally, the ALJ found that Plaintiff could frequently handle, finger and feel, but not on a continuous or repetitive basis. (R. at 23.) Substantial evidence supports the ALJ's assessment of Plaintiff's RFC.

---

4       In light of *Mascio v. Colvin*, 780 F.3d 632, 639 (4th Cir. 2015), this Court entered an order on April 14, 2015 (ECF No. 15), directing Defendant to brief whether *Mascio* impacts the issues in this case. Defendant filed a Memorandum, arguing that the ALJ adequately addressed Plaintiff's functional limitations when the ALJ determined Plaintiff's RFC and that the ALJ properly analyzed Plaintiff's credibility. (Def.'s Supplemental Br. In Light of *Mascio v. Colvin* ("Def.'s Supplemental Br.") (ECF No. 17) at 2-8.) Plaintiff did not file a response. The Court concludes that *Mascio* has no impact on this case.

Plaintiff's medical records support the ALJ's RFC determination. The ALJ expressly considered Plaintiff's migraines in her assessment of Plaintiff's RFC. (R. at 23-26.) The ALJ found that Plaintiff's routine treatment and mild to moderate symptoms did not interfere with her RFC, and that the medical records support the ALJ's assessment. (R. at 23-26.) For instance, Plaintiff told Dr. Kahlon that over-the-counter Excedrin helped relieve her headaches for short periods of time. (R. at 770.) Though she experienced side effects with the generic version, she reported some success with brand-name Topamax. (R. at 774, 867.) Plaintiff denied symptoms such as nausea, vomiting and sensitivity to light or sound, with the exception of perhaps bright sunlight, in connection with her headaches. (R. at 730.) She also denied photophobia and blurred vision during multiple emergency room visits. (R. at 928, 956, 968, 981, 1006, 1031.)

Plaintiff even denied headaches during numerous appointments with Dr. Gladfelter in 2013. (R. at 862, 865, 1047, 1050, 1053.) She also failed to see a neurologist about her headaches, though Dr. Gladfelter instructed her to do so many times. (R. at 824, 871, 874, 881.) Dr. O'Donnell instructed Plaintiff to return for another appointment six months after he saw her a testament to her routine treatment. (R. at 917.) Dr. Revan assessed only mild limitations in sitting, standing and walking, which is consistent with the ALJ's determination of sedentary work. (R. at 467.)

Plaintiff's own statements also support the ALJ's determination. Plaintiff stated in her Function Report that she got herself and her daughter ready for school and took her daughter to school via public transportation. (R. at 317.) Plaintiff could care for herself and prepare her own meals, as well as meals for her daughter. (R. at 317-18.) She could perform household chores, such as sweeping, dishes and dusting. (R. at 319.) Plaintiff could drive and shop in stores. (R. at 319-20.) She engaged in hobbies of reading and watching television, went to church and went

out to eat with her family. (R. at 320-21.) She could walk up to two blocks before stopping to

rest for five minutes. (R. at 321.) She did not have trouble paying attention, finishing what she

started, following instructions or getting along with authority figures, though she noted that she

had trouble remembering things. (R. at 322-23.)

Plaintiff testified during the hearing before the ALJ that she watched movies with her

kids and took them out to eat. (R. at 46-47.) She drove twelve miles to church every Sunday

and attended weekly Bible studies and choir practices. (R. at 59-64.) She went to the grocery

store monthly and got food or a movie rental once a week for family nights. (R. at 53, 64-65.)

She could dress and shower herself daily, perform household chores like sweeping, mopping and

vacuuming weekly, and could do laundry every other day. (R. at 55, 58-59.) She stated that

even on days when she needed to lie down, she got up to cook and in fact cooked as often as

every day. (R. at 51-52, 56-57.) She watched television for a few hours and read daily, and

conducted internet research weekly. (R. at 60-63.) She had no difficulty sitting. (R. at 52.) She

could stand for an hour, walk for thirty to forty-five minutes and lift five pounds. (R. at 53-54.)

She also testified that her medications slowed her headaches down and decreased her levels of

pain. (R. at 49-51.)

The ALJ also considered the impact of Plaintiff's obesity expressly and her determination

of Plaintiff's RFC for sedentary work is consistent with the limitations of obesity. (R. at 25.)

Plaintiff testified during the hearing that she did not have difficulty sitting. (R. at 52.) Like the

ALJ, Dr. Kahlon observed that Plaintiff's weight may affect her headaches. (R. at 25, 789.)

This does not change the fact, however, that Plaintiff's symptoms remained mild to moderate and

her treatment was routine, as noted by the ALJ. (R. at 25.) For instance, Dr. Gladfelter

recommended treatment of diet and exercise, advising Plaintiff to monitor her diet for less

35

carbohydrates and fats. (R. at 828, 894.)  Additionally, Plaintiff refused evaluation for bariatric surgery when discussing her obesity with Dr. O'Donnell.  (R. at 912.)  During Dr. Revan's examination of Plaintiff, Plaintiff did not need an assistive device and needed no help changing for her exam or getting on and off the exam table.  (R. at 465.)  Plaintiff could also rise from her chair without difficulty.  (R. at 465-66.)  Dr. Revan assessed only mild limitations in sitting, standing and walking.  (R. at 467.)  Therefore, substantial evidence supports the ALJ's RFC determination.

## VI. CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 13) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 14) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____ /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: September 28, 2015